# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | |
|---|---|
| KELLY MORRIS, ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: 5:13cv00095 |
| ) | |
| v. ) | |
| ) | |
| SHEETZ INCORPORATED, ) | By: Hon. Michael F. Urbanski |
| ) | United States District Judge |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION

In this case, Kelly Morris ("Morris") claims her termination from her position as a store manager for Sheetz Incorporated ("Sheetz"), constituted retaliation under the Family and Medical Leave Act ("FMLA") and discrimination under the Americans with Disabilities Act ("ADA"). Sheetz moved for summary judgment on both the retaliation claim and the discrimination claim. Dkt. No. 28. Morris filed an opposition brief, and the court heard oral argument on January 8, 2015. For the following reasons, the court will grant Sheetz's motion for summary judgment.

### I.

Morris's employment with Sheetz began in 2001, and in 2004, she became a store manager of the Sheetz store in Opal, Virginia. Compl., Dkt. No. 1, at ¶ 9. Morris claims she performed her job adequately and "consistently received above average performance reviews, bonuses, awards, and commendations for her work." Id. at ¶ 11. Morris suffers from bipolar disorder, anxiety, and depression. Id. at ¶ 12. At least twice in 2011 Morris took FMLA leave, and she returned to her position of manager of the Opal store both times. Morris Dep., Dkt. No. 28-3, at 55:2-22, 61:6-62:11. In 2012, Morris missed work from May 1 to May 8 due to a respiratory ailment. Id. at 73:2-17; Snider Decl., Ex. 1, Dkt. No. 28-5, at *13. Morris discovered she was not placed on FMLA leave for this absence, and on May 7, she faxed documentation to Sheetz's corporate office so that her

absence would be considered as FMLA leave. Id. at 77:2-78:18.[1] She returned to work on May 8. Morris received approval of her May 1 through May 8 absence as FMLA leave on May 14, 2012. Snider Decl., Ex. 1, Dkt. No. 28-5, at *13.

Upon her return, Morris's district manager and supervisor, Karen Stevens ("Stevens") had Morris report to a different store for a meeting and asked Morris if she was taking any medication. Morris responded that she had been prescribed medication for her mental health conditions. Compl., Dkt. No. 1, at ¶ 14. According to Morris, Stevens told her "to go home and talk to my husband. [Stevens] wanted me to quit. . . . And I asked her, so, are you saying that you do not want me as a manager and she said yes." Morris Dep., Dkt. No. 28-3, at 86:21-87:4. After her meeting with Stevens, Morris left work and visited an urgent care center because of a migraine. She stayed home from work again through May 10. Id. at 127:6-22.

According to Sheetz, Morris's store was underperforming, and Morris displayed poor managerial skills and judgment which ultimately led to her termination. As early as December 2011 Stevens noted weaknesses in Morris's evaluations, and her concerns about Morris's job performance increased through 2012. Dkt. No. 28-4, at *2; Stevens Decl., Dkt. No. 28-6, at *3-4. Stevens felt she had to spend more of her time supervising the Opal store and had to bring in staff from other stores to help run the Opal store. Stevens Decl., Dkt. No. 28-6, at *4.

On the first day of Morris's May 2012 FMLA leave, she neglected to tell her staff about a scheduled food and lottery inspection, and the store was unprepared for those inspections. Id. at *5; Morris Dep., Dkt. No. 28-3, at 152:4-153:9. Later that day, the Opal store's staff were again surprised by a scheduled retail inventory inspection Morris neglected to inform them about. Id. at *6. The next morning, Stevens e-mailed her human resources coordinator, Lainie Snider ("Snider"),

---

[1] According to Morris, Sheetz's policy is to place an employee on FMLA leave after an absence of more than three days. The employee must then submit documentation in order for Sheetz to verify that the absence qualified as FMLA leave. Morris Dep., Dkt. No. 28-3, at 7:21-78:9.

2

explaining her frustrations with Morris's job performance. Stevens Decl., Ex. 3, Dkt. No. 28-7, at *14. Stevens referred to Morris as a "hypochondriac" who gets sick "at the most inopportune times." Id. During this same time, Stevens received a copy of the results of an internal survey conducted in March 2012 suggesting some poor employee morale at the Opal store. See Stevens Decl., Ex. 4, Dkt. No. 28-7, at *38-39.[2] Stevens also claims that employees complained about Morris's managerial abilities while she visited the store during Morris's absence. Stevens Decl., Dkt. No. 28-6, at *7-8.

On May 7, Stevens e-mailed her supervisor and reiterated some of the concerns she expressed to Snider earlier in the week. Stevens thought that the situation with Morris would be "a progressive discipline termination in time . . . if she doesn't quit . . . tomorrow. [Morris] is very unstable. I never know how she will react to things. Her personality changes from day to day." Stevens Decl., Ex. 5, Dkt. No. 28-7, at *41. In response, Stevens's supervisor thought it would be a good idea for Stevens to arrange meetings with the Opal store employees due to the "concerning" statements in Stevens's May 7 e-mail. Stevens Decl., Ex. 6, Dkt. No. 28-7, at *47. Morris returned to work the next day, May 8, and informed Stevens of her bipolar disorder.

Stevens asked Morris to work at a different store while Stevens interviewed Morris's staff. Stevens summarized her findings in a May 13 e-mail to her supervisor and Snider. See Stevens Decl., Ex. 10, Dkt. No. 28-7, at *63-65. Based on the information she received during those interviews, Stevens developed an action plan and gave Morris a formal disciplinary notice. The action plan addressed several problem areas including: poor communication in the store, employee complaints, employee turnover, understaffing, poor scheduling practices, lack of preparation for scheduled inspections, a security risk due to the removal of locks from the cash register safes, failure to notify

---

[2] One of the methods used by Sheetz to evaluate store managers' performance is a quarterly survey of each store's employees. Part of the internal survey requires staff to answer open-ended questions regarding their store and store manager.

3

management of a lost key to the propane tank cage resulting in lost sales, and failure to notify management of a broken money order machine resulting in lost sales. The action plan asked Morris to "create a plan to get on board 100% to gain [her employee's] respect back or leave the company and move on to something else." Dkt. No. 28-4 at *42.

In June, Snider instructed Stevens to suspend Morris for failing to report an employee's pending criminal charges in accordance with company policy. Stevens Decl., Ex. 13, Dkt. No. 28-7, at *75.[3] In July, Stevens asked Snider if she could discharge Morris for poor performance. Stevens cited another failed food safety inspection, poor scores, failed tobacco shops for failure to verify a shopper's age, the store's lack of cleanliness, deposit shortages resulting from the failure to balance the cash safe each shift, and numerous customer complaints about the store since Morris received her action plan in May. Stevens Decl., Ex. 14, Dkt. No. 28-7, at *77. Snider approved the request and instructed Stevens to discharge Morris for unsatisfactory performance. Snider Decl., Dkt. No. 28-5, at *10-11; Stevens Decl., Ex. 17, Dkt. No. 28-6, at *102.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Glynn v. EDO Corp.</u>, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. <u>Celotex</u>, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes

---

[3] Morris claims she did not know about this policy. Morris Dep., Dkt. No. 28-3, at 181:14-182:5.

that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. June 25, 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the Court must determine that no reasonable jury could find for the non[-]moving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

5

## A.

The Family and Medical Leave Act provides certain "covered" employees with 12 weeks of leave during any 12-month period for the purpose of a family or medical reason. 29 U.S.C. § 2612(a). After taking such leave, the employee must be restored to her position or to an equivalent position upon her return to work. Id. An employer may not discriminate or retaliate against an employee for exercising her FMLA rights. 29 U.S.C. § 2615. It is the employee's burden to give notice to her employer in order to trigger the protections afforded by the FMLA. Krenzke v. Alexandria Motor Cars, Inc., 289 F. App'x 629, 632 (4th Cir. 2008) (unpublished per curiam decision). To satisfy this burden, the employee "need only inform her employer that she needs leave from work for a medical reason." Id. The employee is not required to "'expressly assert her rights under the FMLA or even mention the FMLA, but may only state that leave is needed.'" Id. (quoting 29 C.F.R. § 825.303(b)).

FMLA retaliation claims are analyzed under the McDonnell Douglas Corp. v. Green burden-shifting framework because they are "analogous to those [claims] derived under Title VII." Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 550-51 (4th Cir. 2006). Under that framework, the burden first lies with the plaintiff to make a "prima facie showing 'that [s]he engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity.'" Id. (quoting Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998)). The plaintiff must prove a prima facie case of retaliation by a "preponderance of the evidence." See Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 513 (4th Cir. 2006) (applying McDonnell Douglas framework in age-discrimination case).

To establish the requisite causal connection the plaintiff must show that the relevant official was aware of the protected activity at the time of the alleged retaliation. Wright v. Sw. Airlines, 319 F. App'x 232, 233-34 (4th Cir. 2009) (unpublished per curiam decision) (citing Dowe v. Total Action

6

Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998)); see also Baqir v. Principi, 434 F.3d 733, 748 (4th Cir. 2006); Hooven-Lewis v. Caldera, 249 F.3d 259, 273 (4th Cir. 2001). Furthermore, "*temporal evidence alone* cannot establish causation for a prima facie case of retaliation, unless the 'temporal proximity between an employer's knowledge of protected activity and an adverse employment action' was 'very close.'" Shields v. Fed. Exp. Corp., 120 F. App'x 956, 963 (4th Cir. 2005) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).

There is no question Morris engaged in protected activity by taking FMLA leave and suffered an adverse employment action. See Yashenko, 446 F.3d at 551. As to the third prong, causation, Morris gave Stevens adequate notice that she needed FMLA-qualifying leave by informing Stevens "she had a doctor's note to be out sick until May 8, 2012." Stevens Decl., Dkt. No. 28-6, at *4; see Krenzke, 289 F. App'x at 632; Wright, 319 F. App'x at 233-34. Further, given the close temporal proximity between Morris's FMLA leave, Stevens's early May e-mails, and Morris's termination, the court concludes that Morris has put forth sufficient evidence as to the requisite causal connection to make out a prima facie case. However, that does not end the summary judgment inquiry.

If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to offer a legitimate, non-retaliatory reason for the adverse employment action. Shields, 120 F. App'x at 963. If the defendant provides a non-retaliatory reason, the plaintiff may overcome it with evidence "'that the employer's proffered explanation is pretext for FMLA retaliation.'" Id. (quoting Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001)). In order to show pretext, the employee must prove "'both that the reason was false and that [retaliation] was the real reason for the challenged conduct.'" Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007) (quoting Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997)).

7

In the retaliation context, it is the "perception of the decisionmaker which is relevant not the self-assessment of the plaintiff," and Sheetz is entitled to summary judgment if no reasonable juror could conclude that its "explanation is unworthy of credence." Holland, 487 F.3d at 218 (internal quotations omitted). Crucially, it is not the province of the court to either act as a "super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination" or "to decide whether the [employer's] reason was wise, fair, or even correct, ultimately, so long as it was truly the reason for the plaintiff's termination." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998). Indeed, Sheetz's burden is merely one of production, not persuasion, under the McDonnell Douglas framework. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

1.

Sheetz maintains that it fired Morris for poor job performance, and the evidence overwhelmingly supports this conclusion. The sequence of events culminating in Morris's dismissal confirms Sheetz's legitimate, non-retaliatory reason for firing her. Based on the evidence presented, the court finds that no reasonable jury could conclude otherwise.

Sheetz documented concerns about Morris's job performance at least as early as December 2011. After complimenting Morris in a performance review, Stevens made the following comments regarding Morris's leadership ability:

> I feel that only one thing is holding you back from taking your store to the top. It's the victim mentality of saying #221 is different. I have heard that so many times and it really drives me crazy. . . . You are the leader of this store and saying that #221 is different sounds like you all are victims and that there is some kind of conspiracy out to get you. . . . The employees don't need to hear their leader saying that kind of thing. . . . They don't need to hear that things are going wrong because our store is different and people don't understand what it's like to work here! That is crap and that sounds like excuses. Please think about this and look for ways to change everyone's thought process.

8

Stevens Decl., Ex. 2, Dkt. No. 28-7, at *12. In that same review, Stevens identified some specific problems with Morris's performance, including the need for

> a manager up front at all times. This is a real weakness at your store and can help to fix many of the problems you are experiencing. Customer Service Scores were well under goal . . . . This is way too low for you or your store. . . . . Another area of opportunity is the QA Inspection scores. You finished off the year at the bottom of the District. I expect more from you.

Id. at *11.

On May 1, 2012, Morris began her FMLA leave lasting through May 8, 2012. On May 2, Stevens sent an e-mail to Snider describing her frustrations with Morris's job performance. Stevens noted she felt as if Morris was trying to turn other managers against Stevens, Morris's subordinates were often left to run the store without her, and Morris failed to alert her staff of upcoming inspections before taking her leave. Stevens Decl., Ex. 3, Dkt. No. 28-7, at *14. Stevens asked Snider if she could write up Morris for "job performance or insubordination" and asked whether she should "create an action plan of [her] expectations." Id.

Stevens followed the May 2 e-mail with another e-mail to her supervisor on May 7. Stevens Decl., Ex. 5, Dkt. No. 28-7, at *41. In that message, Stevens described problems with employee morale at the store and Morris's low internal survey scores. Id. Morris's internal survey scores dropped from the fall of 2011 to the spring of 2012. Dkt. No. 36-1 at *33. In response to open-ended questions in the internal survey, some of Morris's employees made the following responses:

> employees should be treated equally and not given special treatment.
>
> The Store Manager promotes nepotism and people who are productive, know what they are doing are not promoted because they don't toe her line. Notifications sent from Sheetz HQ regarding leaves are not properly posted and if someone from the management team posts that [sic] are reprimanded.
>
> Sometimes I get made fun of or ridiculed in a not so professional way and it's not fair to me, but lately that has changed.

9

> Sometime[s] I feel as though if there's a problem it's not addressed to me directly. I would love to hear about my performance whether good or bad and where I can improve. I strive off feedback from managers and if I do something wrong I'd appreciate if I heard about it directly.
>
> . . . .
>
> It isn't that bad working here I just wish it was more fair. Gossip gets out of hand and I don't believe it is always handled the correct way. It is hard to trust my fellow managers sometimes. This job would be much better if there was more professionalism.
>
> . . . .
>
> I wish everything was fair and I think the current management team needs real improvement.
>
> . . . .
>
> . . . I would actually enjoy working here if everyone was treated fairly and policies were consistent to fit everyone.
>
> . . . .
>
> People don't like working at the store because of a racially vitiated atmosphere created by the Store Manager.

Dkt. No. 36-1 at *32-33. These responses reflect significant concerns about management and the work atmosphere at the store. Not all of the employees shared these sentiments. See id. ("it's a great place to work"; "IT'S THE BEST"; "Kelly is doing a nice job"; "it is a friendly and great atmosphere"; "great teamwork among employees"). Another employee described the Opal store as having a "negative" culture, claimed Morris used the schedule "as a weapon," and reported that Morris "most of the time bring[s] in personal problems to work then deals with business." Stevens Decl., Ex. 9, Dkt. No. 28-7, at *59. Undoubtedly, some of Morris's employees liked working for her, but the positive comments do not dismiss the fact that Morris received a very low survey score from her staff, and "[q]uite a few of [the] statements [were] very concerning" to upper management. See Stevens Decl., Ex. 6, Dkt. No. 28-7, at *47.

10

In the May 7 e-mail, Stevens described Morris as "unstable" and that her "personality change[d] from day to day," but those comments were made before Stevens had any knowledge of Morris's bipolar disorder. See Stevens Decl., Ex. 5, Dkt. No. 28-7, at *41. Stevens's supervisor responded by asking Snider if Stevens should meet with the employees because of the concerning statements in Stevens's e-mail. Stevens Decl., Ex. 6, Dkt. No. 28-7, at *47. So, even before Morris disclosed her mental health condition, Stevens wanted to discipline her for "job performance or insubordination," and Stevens's supervisor wanted her to conduct interviews with the employees regarding Stevens's observations from her time at the store and the results of the internal survey. On May 8, 2012, Morris returned to work, met with Stevens, and informed Stevens of her bipolar disorder. Stevens then relayed that information to Snider. Morris confirmed that Stevens did not call her unstable during that meeting. Morris Dep., Dkt. No. 28-3, at 225:1-7.

Morris received a disciplinary notice on May 21, 2012 for issues Stevens discovered at the store while Morris was away. The discipline notice lists "did not prepare store for scheduled inventory, did not call in lost propane keys, broken safes, broken money order machine." Compare Stevens Decl., Ex. 12, Dkt. No. 28-7, at *70 with Ex. 10, Dkt. No. 28-7, at *64-65. Stevens categorized these issues as "[u]nsatisfactory job performance." Id. Stevens developed an action plan for Morris in conjunction with that disciplinary notice. Id. at *71-73. The action plan states: "The following items have not been performed up to the standards outlined in the Manager Job Description and need improvement in order for you to do your job successfully." Id. at *71. According to the plan those items needing improvement were "essential functions" of Morris's job. Id. The action items addressed "Customer First Culture," "Foster Sheetz Culture and Work Environment," "Fully Staffed and Trained Store," "Administering and Implementing Programs, Policies, and Procedures," "Executes Essential Business Processes to Achieve Financial Results," "Develop Store Team," "Community Relationships," and "Communication." Id. at *71-73. Stevens

11

concluded the action plan by noting Morris had a "big problem on [her] hands" in addition to making the following comments:

> While you have been out of your store I have grown to know your people and see how your store runs. You have great [employees] that need a leader that they can depend on. They don't need someone that sits in the office constantly and bails when the going gets tough. Your store needs structure. . . . You need to get yourself together and decide what you are going to do about these issues and either create a plan to get on board 100% to gain your [employee's] respect back or leave the company and move on to something else. The ball is now in your court.

Id.

On June 7, Snider instructed Stevens to suspend Morris for failing to report an employee's arrest. Snider Decl., Dkt. No. 28-5, at *17-18; Snider Decl. Ex. 14, Dkt. No. 28-5, at *61. On July 16, Stevens asked Snider if she could terminate Morris "for job performance." Stevens's reasons included low QA scores due to unsatisfactory cleanliness at the store, low "shop scores" due to cleanliness issues, eighteen customer complaints since Morris received her disciplinary notice, and two tobacco shop fails by the same employee for not asking a customer for proof of age. Stevens Decl., Ex. 14, Dkt. No. 28-7, at *77. The next day, Stevens sent another e-mail informing Snider that the number of customer complaints had increased to twenty, and the store's safe had not been balanced in over two weeks despite the fact that it was supposed to be balanced after every shift. Stevens Decl., Ex. 15, Dkt. No. 28-7, at *79. Snider consulted with her supervisor, and both agreed that they had sufficient grounds to terminate Morris for her poor performance. Snider Decl., Dkt. No. 28-5, at *10-11. Stevens terminated Morris on July 19 for unsatisfactory job performance. Snider Decl., Ex. 17, Dkt. No. 28-7, at *67.

Pretext requires a showing that "the employer's proffered reasons have no basis in fact, were not the true factors motivating the decision or were insufficient to motivate the decision." Reeves v. Sanderson Plumbing, 530 U.S. 133, 143 (2000). Sheetz's reason for firing Morris is supported by a

12

substantial factual basis, and Morris fails to put forth any, much less "adequate," evidence of "intentional discrimination" or retaliation. See Hicks, 509 U.S. at 507. Sheetz documented performance issues with Morris as early as 2011 and found several problems at her store before Stevens or Snider were even aware that Morris claimed that she suffered from a mental health condition. Stevens continued to have problems with Morris's job performance thereafter. Morris received a disciplinary notice with an action plan, a suspension, and a counseling session on the action plan before Sheetz decided to terminate her employment. Sheetz provided a legitimate reason for terminating Morris and supported that decision with ample evidence.

## 2.

Morris's pretext argument as to her FMLA claim fails because she relies on nothing more than her own speculation and conjecture to try to create an issue of material fact. For example, in the comments to Morris's 2011 performance review, Stevens wrote to Morris: "You have had so many personal challenges this last year that I was concerned you wouldn't be with us and I am glad that everything is working out for you now." Stevens Decl., Ex. 2, Dkt. No. 28-7, at *11-12. Morris "understood" that comment to "refer to her use of FMLA leave and medical issues during that year." Pl.'s Br., Dkt. No. 34, at *4. Nothing in that benign comment refers to FMLA or even Morris being absent from work. Morris also directs the court's attention to Stevens's statements in an e-mail to human resources on May 2 describing Morris as

> a hypochondriac. Anytime [Stevens] discuss[ed] anything with [Morris] or push[ed] [Morris] to do better she gets sick and is off work. It has happened over and over and happens at the most inopportune times such as when she is due a QA inspection or when her store is short staffed.

Stevens Decl., Ex. 3, Dkt. No. 28-7, at *14. That statement neither mentions nor alludes to any protected leave used by Morris during her tenure at Sheetz or any prolonged periods of leave taken by Morris.

13

Morris further argues that a jury issue exists as to her retaliation claim because Stevens made her feel like she needed to be at her store "100 percent[;] when I'm at my store, they need me. I cannot take time off. I cannot get sick. I can't afford to do any of that. It was too much for a store like mine." Morris Dep., Dkt. No. 28-3, at 224:12-16; accord id. at 47:19-20, 56:8-10, 56:21-57:2, 57:15-16, 57:22-58:2, 58:14-17, 59:6-10, 106:4-108:17. Fully crediting Morris's beliefs as to Stevens's expectations, however, no jury issue exists as Morris consistently testified that Stevens never told her she could not take time off or take FMLA leave. See id. at 57:3-13, 75:19-21. Rather, as the testimony reveals, the issue concerned Morris's pattern of trying to cover multiple shifts at her store and the effect it had on her job performance. Defense counsel asked Morris:

> Q: And your regularly scheduled shift is from 6:00 to 4:00?
>
> A: Right.
>
> Q: So, you would leave before your regularly scheduled shift?
>
> A: Right.
>
> Q: And then come back during other shifts?
>
> A: Right. Well during the following – whatever shift needed to be covered. And then you would take an hour ride home and an hour ride back it doesn't give you much time to sleep, and work an entire – another shift, especially when you are working overnight, so you're not working much.
>
> . . . .
>
> Q: Right.
>
> A: That's why working, as [Stevens] suggested, the days and let my assistants cover more would be more beneficial.
>
> Q: So, she was suggesting that so that you would not have to be driving back and forth so much, right?
>
> A: That my health would be better.
>
> Q: So, she was encouraging you to make some changes in what you were doing and how you were performing your job in order to improve your health?

14

> A: In order to improve that I was there 100 percent.
>
> . . . .
>
> Q: Okay. But actually wasn't she suggesting to you that you were there – that you'd be there less in that you wouldn't be there every shift, you would just be there on one shift?
>
> A: She wanted me there on day shift.
>
> Q: Your regularly scheduled shift, right?
>
> A: Yes.
>
> Q: And she didn't want you covering other shifts, which you had been doing, correct?
>
> A: I was doing what I thought was best for my store.
>
> Q: And she didn't want you to do that anymore, correct?
>
> A: Correct.

Id. at 105:4-108:17. For example, Morris missed work during an annual high-traffic weekend because of her self-imposed, erratic work schedule. Id. at 119:5-16.

According to Stevens's declaration, Sheetz needed Morris "100%, meaning 100% dependable, 100% focused on her job, and 100% at the Store during her assigned shifts (as opposed to working portions of more than one shift, which she had been doing)." Stevens Decl., Dkt. No. 28-6, at *20-21 n.4. Morris made corresponding observations in a written statement after her May 8 meeting with Stevens. Dkt. No. 28-4 at *27-30. Morris wrote, "As far as my dedication to the store I've worked many shifts lately to be dedicated – I understand now that it would have been better to stay on the shift and be 100% there – not to[o] tired that I don't focus or forget things." Id. at *28. Morris also recognized she "need[s] to be 100% at all times even if it means having others work different shifts. . . . I understand my job performance hasn't been 100% or my mentality." Id. at *29-30. Morris also testified that Stevens wanted her "to work stable shifts as [Stevens] suggested and that would get my attitude more positive and not be so tired." Morris Dep., Dkt. No. 28-3, at 100:12-14. Morris affirmed this later in her deposition as well when counsel asked:

15

| | Q: | She said you have to be physically be at the store all the time? |
|---|---|---|
| | A: | On my scheduled shift 100 percent. |

Id. at 115:3-5. Based on Morris's own statements, Stevens's comments about "100 percent" do not create a factual question as to the FMLA retaliation claim. In short, Morris fails to carry her burden to establish that a reasonable jury could conclude that the reason given by Sheetz for her termination, poor job performance, was pretextual.

**B.**

The Americans with Disabilities Act prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

ADA discriminatory discharge claims are also analyzed under the McDonnell Douglas framework. Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995). In order to make a prima facie showing of discriminatory discharge under the ADA, the plaintiff must prove "(1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Id. (citations omitted).[4] A plaintiff is in a "protected class" for ADA purposes if she has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) . . . regarded as having such an impairment." 42 U.S.C. § 12102. However, "the fact that an employer is aware of an employee's impairment, without more, is 'insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action.'" Haulbrook v.

---

[4] The third prong cannot be satisfied by a plaintiff's argument that she is merely "qualified" for her position. She must have met her employer's legitimate expectations. Warch, 435 F.3d at 520.

Michelin N. Am., 252 F.3d 696, 703 (4th Cir. 2001) (quoting Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996)).

If the plaintiff makes a prima facie showing of discrimination, and the defendant, in turn, presents a legitimate, non-discriminatory reason for the plaintiff's discharge, the plaintiff's pretext argument must be supported by "adequate evidence" "that she has been the victim of intentional discrimination." Ennis, 53 F.3d at 58 (citing Hicks, 509 U.S. at 507). Again, it is the decisionmaker's perception that is relevant to this analysis, not the plaintiff's, and the court will not weigh the fairness, prudence, or even appropriateness of the employer's reason so long as it is the true one. See Holland, 487 F.3d at 218; DeJarnette, 133 F.3d at 299.

**1.**

Morris's ADA discrimination claim fails because she cannot satisfy the third prong of a prima facie claim – that her job performance met her employer's expectations. Morris does put forth evidence that she received raises and some positive comments about her performance leading up to the time she informed Stevens she was bipolar, but she ignores the substantial evidence that Sheetz was not satisfied with her job performance. Viewing the evidence in the light most favorable to Morris, no reasonable jury could conclude that Morris met Sheetz's legitimate expectations. Sheetz documented concerns with Morris's performance at the end of 2011. Stevens's manager found the comments from the internal survey and Stevens's initial interactions with Morris's employees to be very concerning. Morris received a disciplinary notice and an action plan detailing specific areas of her job performance that needed improvement. Customers complained about the store, and the store failed various scheduled inspections because the store and employees were unprepared for them. The store's cash deposits were short, the safe was not balanced regularly, and various equipment in the store was not maintained properly. The evidence is overwhelming that Morris, as the manager and leader of the Opal, Virginia store, was not performing her job adequately.

17

Therefore, Morris fails to put forth a prima facie case of ADA discrimination because no reasonable juror could conclude that Morris met Sheetz's legitimate expectations.

2.

Even were the court to assume that Morris established a prima facie claim for ADA discrimination, however, Morris's claim still fails because, as explained above, she fails to meet her burden of proving that the reason Sheetz gave for firing her, poor job performance, was pretextual. Morris relies on her own opinion of why she was discharged, a notion completely refuted by the record, and cannot show pretext by speculation and conjecture alone.

Morris directs the court to the May 8 e-mail Stevens sent to her supervisor and claims it "makes no mention of customer complaints, financial performance or any other objective measure of Morris's performance . . . ." Dkt. No. 34 at *7. However, Stevens's e-mail and attachment describe several work performance issues. Stevens explains that Morris complained of working "crazy hours" and "mixed up shifts" but had not "worked over 50 [hours] in weeks." Stevens Decl., Ex. 5, Dkt. No. 28-7., at *42. Stevens tried to remedy this particular situation by sending in "our managers and a salesperson from other stores in the district to help cover shifts at Morris's store. Id. at *43. Stevens also reported the store's "[m]argins are a mess. Ordering is not being done correctly. The order was even forgotten on one of the days. Transfers are needed constantly for things that they are out of. Employee morale is at an all time low. This store has no structure." Id. at *45. Stevens's May 8 e-mail certainly addresses Morris's job performance and does not support Morris's claim of pretext.

Morris also relies on her Exhibits 12 and 13, Dkt. No. 36-1 at *20-21, in an effort to establish pretext. Those exhibits are two e-mails from Stevens to Snider sent within thirty minutes of each other on May 9, 2012. In the first e-mail, sent at 7:42 a.m., Stevens copied a text message from Morris that indicated Morris thought she would be able to come to work that day if she "wait[s] for

18

[her] meds." Dkt. No. 36-1 at *20. Stevens concluded her e-mail with "I haven't responded. If this continues I will need medication!" Id. The "meds" Morris referred to were for a migraine that caused her to visit an urgent care center the night before, not medication for her bipolar disorder. Morris Dep., Dkt. No. 28-3, at 127:6-22. In the second e-mail, sent thirty minutes later, Stevens writes

> Kelly just called and I went out of room with my manager and I put my phone on speaker phone so Joyce could hear her. [Morris] was horribly slurry and asking if I wanted her to come in anyway. I told her that I was tired of dealing with this drama to please not contact me until this investigation is over.

Id. at *21. Considering those exhibits with Exhibits 9 and 10 to Stevens's Declaration, however, it is plain that Morris's Exhibits 12 and 13 highlight Stevens's complaints about Morris's inability to make decisions. See Stevens Decl., Ex. 9, Dkt. No. 28-7, at *59 (May 9, 2012, e-mail sent at 6:59 a.m. stating "Kelly called off today."); Ex. 10, Dkt. No. 28-7, at *65 ("She is constantly texting me and her [employees] and going on and on. I have to actually tell her to leave me alone because it goes on and on. She cannot seem to make decisions. She will call off[,] then text and say she will come in[,] and then call off again."). Clearly, Stevens was fed up with Morris's inability to decide whether she would be coming to work that day. See Stevens Decl., Dkt. No. 28-6, at *21. The e-mail exchange between Stevens and Snider on May 9 does not present a question for the jury.

### III.

"Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." Evans v. Techs. Applications & Servs. Co., 80 F.3d 954, 960 (4th Cir. 1996). The evidence before the court affirms that Sheetz fired Morris for poor work performance as a manager. Sheetz proffered a legitimate reason for terminating Morris, and Morris has failed to meet her burden by presenting evidence to the court from which a reasonable jury could find the employer's decision was pretextual. Evans, 80 F.3d at 960. Therefore,

19

Morris's FMLA retaliation and ADA discrimination claims fail. As such, the court finds there is no genuine issue of material fact in dispute and will grant Sheetz's motion for summary judgment.

An appropriate order will be entered this day.

Entered: April 28, 2015

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge